UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In Re:

JOHN M. MANSOUR,

                Debtor.

_____/

THE STATE BANK,                            Case No. 10-14295

                                        Paul D. Borman
              Plaintiff/Appellee,          United States District Judge
v.

                                        Daniel S. Opperman
                                        United States Bankruptcy Judge

JOHN M. MANSOUR,

                Defendant/Appellant.

_____/

## ORDER AFFIRMING THE BANKRUPTCY COURT'S SEPTEMBER 30, 2010, OPINION AND ORDER

### I.  INTRODUCTION

On October 26, 2010, John M. Mansour ("Defendant" or "Appellant") filed this appeal from the Bankruptcy Court.  (Dkt. No. 1).  Appellant filed a Brief on January 7, 2011 (Dkt. No. 8) and The State Bank ("Plaintiff" or "Appellee") filed a Response on January 31, 2011 (Dkt. No. 10).  Appellant filed a Reply on February 11, 2011 (Dkt. No. 12).  Oral argument was held on April 20, 2011.

For the reasons stated below, the Court affirms the Bankruptcy Court's trial opinion.

### II.  BACKGROUND

1

## A.  Appellant's Education and Work History

After earning a degree in accounting from Georgetown University, Appellant worked for an accounting firm for several years before joining a real estate development business owned by his father and uncle in Genesee County.  Appellant also established several real estate development companies, including J.M. Developments, Inc.  By August 1, 2005, Appellant had more than $15 million in total assets, including almost $10 million in real estate.  (Appellant's Br. Ex. 1 - Statement of Net Worth).

Beginning in August 2003, Appellant was elected to and began serving on the Appellee Bank's board of directors.  (Feb. 9, 2010 Trial Tr. at 32).  Appellant served on the board for approximately two years before resigning in May 2005.  (*Id*. at 37).

## B.  Issuance of Loans

After Appellant's resignation from its board of directors, Appellee Bank issued two loans that were personally guaranteed by Appellant.  Appellee first extended a $500,000 operating line of credit to J.M. Developments.  Appellee also made a $2,405,000 construction loan to another of Appellant's business entities, Landings at Crane's Cove LLC, to fund development of a residential condominium project called The Landings at Crane's Cove ("Landings").  In February 2005, the appraised value of the Landings project was $2,479,000, or $37,000 for each of the 67 available units.  (Mar. 1, 2010 Trial Tr. at 14).

Both loan agreements required Appellant to provide Appellee with "true and correct" financial information that "fairly present[ed Appellant's] financial condition[.]"  (Pl.'s Trial Exs. 3 and 10).  Both loan agreements were personally guaranteed by Appellant.

## C.  The Real Estate Market Declines

In 2006, due to the slowing local real estate market, Appellee's loan officer, Jeffrey Langs, became concerned about Appellant's ability to repay his outstanding loan obligations. (Feb. 9, 2010 Trial Tr. at 105).   To address these concerns, Mr. Langs met with Appellant and reviewed his financial statements and individual projects.   Mr. Langs testified that Appellant had a "game plan" in place to continue selling real estate.   (*Id*. at 108).   Satisfied with Appellant's stated "game plan," Mr. Langs and Appellee agreed to renew Appellant's credit and extended the maturation date of his loans.   (*Id*. at 110-11).

Concerns were raised again in June 2007 as the real estate market continued to slow, and Mr. Langs arranged a second meeting with Appellant.   Mr. Langs was aware at this meeting that Appellant's personal residence was under foreclosure.   (*Id*. at 152-53).   Nevertheless, Appellant assured Mr. Langs that he was "stepping up his sales efforts" and was prepared to "carry all the properties into mid-2008."   (*Id*. at 153).

In August 2007, Appellant submitted a financial statement reflecting total real estate assets in excess of $12.8 million, with total liabilities of $12.2 million, and a net worth of over $5 million. (Appellant's Br. Ex. 3 - August 2007 Personal Financial Statement).   This financial statement specifically listed the value of the Landings project at $2,883,000, or $37,000 for each of the 59 units remaining in 2007.   Appellant's financial statement thus did not account for the market drop that occurred between August 2005 and August 2007.   Appellant admitted this at trial:

> Q      Did you factor in the slowing market in your valuation of
>        assets in the 2007 personal financial statement?
>
> A      Probably not.
>
> Q      But you were aware the market was slowing?
>
> A      I was aware that the market was slowing.

3

(Mar. 2, 2010 Trial Tr. at 87).

Mr. Langs testified that he used this financial statement in determining the viability of Appellant's proposed "game plan." (Feb. 9, 2010 Trial Tr. at 115). The head of Appellee's collections department, David Hendry, likewise testified that the August 2007 financial statement was "critical" in determining Appellant's credit worthiness. (Feb. 16, 2010 Trial Tr. at 75). James Peabody, a member of Appellee's board of directors, also testified that he put "a lot of weight on the personal financial statement and the loan officer's review of that personal financial statement" when making loan decisions on behalf of the Appellee Bank. (Mar. 2, 2010 Trial Tr. at 29).

A third meeting between Appellant and Appellee's representatives occurred on December 6, 2007, to discuss the December 20, 2007 maturation date of Appellant's $500,000 line of credit. The meeting also intended to address late payments made on both loans in August, September, and October, which had again raised concerns with Appellee. After discussing Appellant's financial situation, Mr. Langs recommended that the maturity date of Appellant's $500,000 line of credit be aligned with the maturity date of the Landings construction loan, which was March 25, 2008. (Feb. 9, 2010 Trial Tr. at 133).

## D. Greektown Casino Debt

In 2004, Appellant applied for and was granted a $100,000 line of credit at Greektown Casino. (Feb. 16, 2010 Trial Tr. at 121). Appellant thereafter informed Greektown in December 2005 that he would not be able to repay the remaining $90,000 that he owed. (*Id.* at 124). Appellant negotiated several different payment plans with Greektown. However, with $65,500 remaining on his obligation, Appellant stopped making any payments, and the casino filed suit against him on November 30, 2007. (*Id.* at 131). Appellant did not mention the Greektown lawsuit or his liability

4

to Greektown at the December 6, 2007, meeting with Appellee's representatives.  (Feb. 16, 2010 Trial Tr. at 103).

On January 9, 2008, a default was entered against Appellant in the Greektown case.  (Pl.'s Trial Ex. 26 - Entry of Default).  On February 1, 2008, a $65,500 judgment was entered against Appellant and in favor of Greektown.  (Pl.'s Trial Ex. 27 - Judgment).

Nothing about the Greektown Casino gambling debt/judgment appeared on Appellant's financial statement.

**E. Appellant Files for Bankruptcy Protection**

By December 2007, both loans were in default due to Appellant's late payments.  (Feb. 16, 2010 Trial Tr. at 98-99).  However, Appellee Bank did not sue Appellant for default.  In an e-mail dated December 13, 2007, Mr. Hendry stated, "While I 'don't' support renewal, I don't know if I 'strongly' recommend default (at least prior to year-end) either."  (Def.'s Trial Ex. H - E-Mail).  Mr. Hendry recommended having outside counsel review the loan files, but did not recommend immediate action.

As Mr. Hendry testified at trial on February 16, 2010, and as noted in the Bankruptcy Court's Opinion[1], the reason for the Appellee Bank's forbearance in this regard was its reliance on Appellant's representations of his finances.

> Q    Okay.  Here is the question to you, sir.  If these two credit facilities are cross defaulting, . . . and there are multiple events of default on both credit facilities due to late made payments after August, September, and October of 2007, Okay?
>
> A    Okay.

_____

[1]*See* Trial Op. at 4-7.

5

Q Why did The State Bank tolerate all of these multiple events of default after August of 2007?

A Having been a member of various loan committees involved with the ongoing approvals of JMI and Landings, the information related to us, meaning John Mansour's personal financial statement, as well as any other information that might have been contained within the loan presentation, as well as the loan officer Jeff Langs' personal comments or reviews of his relationship with John Mansour and those entities, there was a continued theme throughout that we could rely upon the net worth, the statements that John had made that he would be good for his guarantee and he would make good on those debts throughout that period. And that's what we would have relied on.

Q So just so that I understand, The State Bank tolerated these multiple events of default of these cross defaulting credit facilities because it relied on his August 2007 personal financial statement?

A Correct.

(Feb. 16, 2010 Trial Tr. at 100-01).

On February 13, 2008, Appellant filed for bankruptcy protection. Appellant's Schedule F listed the value of the Landings property as of August 2007 at $1,473,000. (Pl.'s Trial Ex. 23 - Bankruptcy Schedules). In his previous August 2007 Statement of Net Worth given to Appellee, Appellant valued the Landings property at $2,883,000. (Appellant's Br. Ex. 3). Appellant listed several other properties in his bankruptcy schedules with their values significantly reduced when compared to the values listed in the August 2007 financial statement provided to Appellee.

Appellant testified that the August 2007 date in his bankruptcy schedules was a mistake, and that the actual value of the assets was based on the time period just prior to filing. (Mar. 2, 2010 Trial Tr. at 97-99). Appellant also testified that the values in the August 2007 financial statement were based on conducting business normally, while the values in his bankruptcy schedules were

6

based on a forced liquidation sale.  (*Id*. at 97-98).

**F. Proceedings in Bankruptcy Court**

Appellee sought an exception to discharge of the two loans at issue pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (B).  After a five-day bench trial, the Bankruptcy Court concluded that the August 2007 financial statement was materially false for purposes of § 523(a)(2)(B), and "that Plaintiff is entitled to a judgment under 11 U.S.C. § 523(a)(2)(B) as to the $2,405,000 construction loan and the $500,000 line of credit extended by Plaintiff to J.M Developments, Inc. and guaranteed by the Defendant."[2]  (Trial Op. at 14).

Defendant has appealed the Bankruptcy Court's decision to this Court.

### III.  LEGAL STANDARD

This Court has jurisdiction over an appeal from a bankruptcy court in the same district pursuant to 28 U.S.C. § 158.  The Court's review is subject to Bankruptcy Rule 8013, which states:

> On an appeal the district court . . . may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings.  Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

A bankruptcy court's findings under 11 U.S.C. § 523(a)(2)(B) are considered factual findings and are not reversible unless clearly erroneous.  *In re Woolum*, 979 F.2d 71, 75-76 (6th Cir. 1992).

### IV.  ANALYSIS

A debt is nondischargeable under § 523(a)(2)(B) where it is procured by the use of a writing:

> (i) that is materially false;

---

[2]On March 31, 2011, Appellee filed a Stipulated Order Amending the October 12, 2010 Final Judgment Amount to $1,909,490.94.

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit, reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2)(B).

Appellant argues that the Bankruptcy Court erred for two reasons. Appellant first asserts that the Bankruptcy Court's finding of materiality is clearly erroneous. Secondly, Appellant argues that the Bankruptcy Court failed to clearly rule on the element of reasonable reliance.

**A. Materiality**

"A financial statement is materially false if the information offers a substantially untruthful picture of the financial condition of the debtor that affects the creditor's decision to extend credit." *In re Stricker*, 414 B.R. 175, 181-82 (Bkrtcy. W.D. Mich. 2009) (punctuation and citation omitted). Appellant argues that this definition of materiality includes a reliance element. (Appellant's Br. at 21-22). The Court notes, however, that reliance is a separate inquiry under § 523(a)(2)(B)(iii). For purposes of the materiality element, "[i]t is the cause and effect – false statement and resultant credit extension – that is critical to the analysis, not the conscious thought process or volition of the lender." *In re Kakde*, 382 B.R. 411, 421 (Bkrtcy. S.D. Ohio 2008). This inquiry is therefore limited to whether a creditor *could* have relied on the fraudulent information, which is separate from the later inquiry regarding whether the creditor *did* rely. *See id.* at 420-21.

Appellant argues that the August 2007 financial statement could not have been "substantially untruthful" because Appellant's hidden $65,500 debt to Greektown Casino constituted approximately one-half of one percent of his liabilities. Appellant then asserts that "the financial

8

statement was approximately 99.5% accurate as to his total liabilities, and 98.8% accurate as to his net worth." (Appellant's Br. at 23).

While Appellant is correct in pointing out that the size of the discrepancy is an important factor in the materiality analysis, *see Kakde*, 382 B.R. at 421, his insistence that the August 2007 financial statement was otherwise accurate is not well founded.

As the Bankruptcy Court noted, the August 2007 financial statement was materially false for two reasons: Appellant's inflated valuation of his real estate holdings and his omission of the Greektown Casino debt. In its analysis of the materiality element, the Bankruptcy Court held:

> [a]s to the value of the Defendant's real estate financial holdings, . . . that his statements were improperly based upon information that Defendant knew to be at least one to two years old. Aside from the obvious staleness of this information, the Michigan economy in 2006 through 2007 certainly would lead anyone to conclude that real estate values in 2005 or 2006 were simply not true in August, 2007. The fact that Defendant was an experienced real estate developer and had a degree in accounting, as well as a former member of Plaintiff's board of directors, certainly added [to the] awareness of Defendant that the information that he relied upon was not true.

(Trial Op. at 12). The Bankruptcy Court then addressed Appellant's omission of the Greektown Casino debt:

> It is clear from the testimony that Defendant owed the Greektown Casino at least $70,000 as of December, 2005, and he had only paid this obligation down to $65,500 by the time the August, 2007, personal financial statement was tendered to Plaintiff. The complete failure to note this obligation renders the August, 2007, personal financial statement materially false . . .

(Trial Op. at 12).

The Bankruptcy Court's finding of materiality was therefore based on both the falsity of Appellant's real estate valuations and his failure to include the Greektown Casino debt. By reading

the full opinion rather than the excerpt on which Appellant focuses his argument, it is clear that the trial court found the August 2007 financial statement substantially untruthful based on a combination of the inflated real estate values and omission of the gambling debt.

Moreover, the Greektown Casino debt by itself may have constituted a "red flag" if it had been listed. *See In re Ledford*, 970 F.2d 1556, 1560 (6th Cir. 1992). The presence of a large gambling debt, which Appellant had decided to stop paying, would certainly have alerted the Bank to Appellant's lifestyle of heavy gambling and large gambling debts. This certainly could have affected Appellee Bank's decision on whether to extend credit.

Accordingly, the Court cannot conclude that the Bankruptcy Court clearly erred in finding that Appellant's financial statement was a material misrepresentation. *See In re Ireland*, 441 B.R. 572, 578, 582-83 (Bkrtcy W.D. Ky. 2011) (concluding that a financial statement that "had numerous discrepancies and inconsistencies between its amounts and those listed on the Defendants' schedules" was materially false, and noting that to claim the misrepresentations were not material "would be like claiming that even if the Defendants had told the truth, it would not have mattered. This is confusing quantitative materiality with qualitative materiality. It is not a matter of how much the Defendants inflated their net worth but the fact that the Defendants did inflate their net worth.").

Appellant also argues that, because there is no testimony that the Appellee Bank would have acted differently if it knew of Appellant's $65,500 Greektown Casino debt, the Bankruptcy Court should not have found omission of the debt to be material. While this argument is not persuasive for the reasons explained above, the Court also notes that the Bankruptcy Court did hear testimony that could support a finding that omission of the Greektown debt was material:

> Q    I'm going to ask this of you as a hypothetical for now, okay?
> Hypothetically if when you made your recommendation as set

forth in Exhibit No. 20, that the maturation date for JMI be extended to coincide with the maturation date for Landings out until March of 2008, if at the time you made your recommendation that personal financial statement . . . would have included a liability to Greektown Casino that Mr. Mansour had advised the casino he could not pay, if you would have known that, what if anything would have changed about your recommendation?

A       Well, I'd certainly have to, you know, consider that particularly if the statement was made that the obligation could not be paid.  That might be an indication of the intent to pay other obligations that were coming due not only to us but other creditors.

(Feb. 9, 2010 Trial Tr. at 136-37).

Likewise, Mr. Hendry testified that Appellant's refusal to pay Greektown Casino would have raised concerns if it had been disclosed:

Q       If you would have known going forward from December 5 or December 6, 2007, through February 13, 2008, that Mr. Mansour had in fact been sued by Greektown Casino, would you have wanted to know that?

A       Absolutely.

Q       Why?

Q       Again because that impacts his ability to repay the debt and his overall financial condition.  We would have been very concerned about that.

(Feb. 16, 2010 Trial Tr. at 104).

Appellant correctly notes that even if the August 2007 financial statement had listed the Greektown Casino obligation, it would not have disclosed that Appellant had stopped making payments on that obligation.  However, this does not make the omission immaterial.  If it had been disclosed, Mr. Langs or Mr. Hendry may have, and likely would have, inquired about the status of

11

the debt in either August or December of 2007.

The Bankruptcy Court concluded based on this evidence that the omission of the Greektown Casino debt from the August 2007 financial statement, coupled with Appellant's inflated real estate asset valuations, caused the written statement to be materially false. The Court cannot conclude, based on the trial testimony and extensive evidentiary record, that the Bankruptcy Court clearly erred.

## B. Reasonable Reliance

Appellant argues that remand is required because the Bankruptcy Court did not clearly rule on the element of reasonable reliance. Appellant asserts that:

> since the Court erred in holding the failure to include the Greektown Casino indebtedness in Mr. Mansour's August 2007 personal financial statement was material, the only way the Court's judgment in favor of The State Bank can be upheld is if it also ruled in The State Bank's favor on the overstatement of the real estate values in that financial statement. This, however, requires that the Bank had reasonably relied on those values, but the Court's ruling thereon is ambiguous.

(Appellant's Br. at 32-33).

The reasonable reliance requirement "cannot be said to be a rigorous requirement, but rather is directed at creditors acting in bad faith." *In re Martin*, 761 F.2d 1163, 1166 (6th Cir. 1985). "A district court reviewing a bankruptcy court's determination of reasonable reliance is not to undertake a subjective evaluation and judgment of a creditor's lending policy and practices." *In re Woolum*, 979 F.2d 71, 76 (6th Cir. 1992) (citation omitted).

The Bankruptcy Court's opinion states as follows:

> The Court, therefore, concludes that the personal financial statement of Defendant submitted in August, 2007, was false as to the real estate values and the failure to disclose the Greektown Casino

12

> obligation.  Plaintiff has shown reliance on that statement as to the
> $2,405,000 construction loan and the $500,000 line of credit.

(Tr. Op. at 14).  The Court finds no ambiguity in the above quoted language.

The Court further notes that several witnesses testified in support of Appellee's reliance on the August 2007 financial statement.  Mr. Hendry described his level of reliance as "critical"  (Feb. 16, 2010 Trial Tr. at 75), and stated:

> With the educational background that – that Mr. Mansour had as an
> accountant, with the many years of successful experience and – and
> in – in employment, I guess, or ownership of his own development,
> commercial development company, his family background has been
> in successful development, land development.  All those – all those
> things would give us a heightened reliance upon his values.

(*Id*. at 83).  Mr. Peabody also testified that he relied on Appellant's August 2007 financial statement. (Mar. 2, 2010 Trial Tr. at 27).  Mr. Langs testified that he "[p]laced a great level of – of reliance on [the August 2007 statement] based on the statement being true."  (Feb. 9, 2010 Trial Tr. at 124).

While the Bankruptcy Court did not specifically rule on which of Appellant's misrepresentations Appellee relied, § 523(a)(2)(B) only requires a showing that the creditor relied upon a materially false statement in writing.  Appellee presented evidence, and the trial court concluded, that Appellee relied upon the August 2007 financial statement, and that the statement was materially false.  The trial court opinion is clear on this issue, and further clarification on remand is not required.

## V.  CONCLUSION

For the reasons stated above, the Court will:

(1) **DENY** Debtor's Appeal, and

(2) **AFFIRM** the Bankruptcy Court's September 30, 2010 Opinion.

13

**SO ORDERED.**


                                        s/Paul D. Borman
                                        PAUL D. BORMAN
                                        UNITED STATES DISTRICT JUDGE

Dated:  April 28, 2011

                        CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on
April 28, 2011.


                                        s/Denise Goodine
                                        Case Manager

14